# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 23, 2012

## ALDRICK D. LILLARD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. F-65218     David Bragg, Judge**

---

**No. M2011-01380-CCA-R3-PC - Filed September 27, 2012**

---

The Petitioner, Aldrick D. Lillard, appeals as of right from the post-conviction court's denial of relief from his convictions for first degree murder, especially aggravated robbery, aggravated burglary, conspiracy to commit aggravated burglary, and conspiracy to commit aggravated robbery.  The Petitioner alleges that the post-conviction court committed reversible errors by (1) refusing to allow the Petitioner to amend his petition for post-conviction relief during the evidentiary hearing; (2) finding that the post-conviction hearing testimony from the assistant district attorney regarding his discussions during trial with the Petitioner's trial counsel was irrelevant; and (3) concluding that the Petitioner failed to prove by clear and convincing evidence that his trial attorneys were ineffective.  After an evidentiary hearing, the post-conviction court merged the Petitioner's two conspiracy convictions but found that the Petitioner failed to prove any additional allegations in his petition for relief. Following our review, we reverse the post-conviction court's ruling prohibiting the Petitioner from amending his petition during the evidentiary hearing. We also conclude that the post-conviction court's finding that the prosecutor's testimony was irrelevant was in error, albeit harmless.  In all other respects, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JEFFREY S. BIVINS, J., concurring in part, dissenting.

Benjamin L. Parsley, III, Murfreesboro, Tennessee, for the Petitioner, Aldrick D. Lillard.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Bill Whitesell, District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The Petitioner, Aldrick D. Lillard, and his two co-defendants were indicted by the Rutherford County Grand Jury for first degree murder, felony murder, especially aggravated robbery, especially aggravated burglary, conspiracy to commit especially aggravated burglary, conspiracy to commit especially aggravated robbery, and theft of property in connection with the death of Randy Betts.[1] After a jury trial, the Petitioner was convicted of first degree murder, felony murder, especially aggravated robbery, aggravated burglary, conspiracy to commit aggravated burglary, and conspiracy to commit aggravated robbery. See State v. Aldrick D. Lillard, No. M2008-00575-CCA-R3-CD, 2009 WL 2951270, at 1 (Tenn. Crim. App. Sept. 15, 2009), perm. app. denied (Tenn. Mar. 15, 2010). The trial court merged the felony murder conviction into the first degree murder conviction, and the jury sentenced the Petitioner to life without the possibility of parole for the murder conviction. See id. On the remaining convictions, the trial court sentenced the Petitioner to an effective sentence of twenty-five years, to be served concurrently with the life sentence. See id.

### I. Trial

The victim, Randy Betts, was discovered by his daughter, Brandy Betts, at around 2:00 p.m. on December 20, 2005.[2] Ms. Betts went to her father's home located at 131 Neal Avenue in Smyrna, Tennessee, to assist him with a Christmas tree and found him lying on the floor "with his eyes open and blood all around him." Ms. Betts left the home immediately and went next door to Ed Davis's house.

William David Elliot was next door at Ed Davis's house on December 20, 2005. When Ms. Betts knocked on the door, she asked for assistance in opening her father's front door. Mr. Elliot and Mr. Davis walked next door where they discovered the victim lying on his back on the floor. The victim was clad in a t-shirt and underwear and had what appeared to be a head wound. Mr. Davis walked around the residence to make sure that there was no one else present while Mr. Elliot called 911 and the Sheriff's Department. They waited

---

[1] The theft of property charge was not submitted to the jury for deliberation, and it was later dismissed.

[2] The trial facts are gleaned from the Petitioner's direct appeal because the trial transcript is not included in the record for this court's review.

at the residence until the police arrived.

When the Rutherford County Sheriff's Office arrived on the scene, Ms. Betts, Mr. Elliot, and Mr. Davis were waiting. According to Lieutenant Glenn Morton, the front door of the residence would only open about a foot and a half. Rutherford County EMS workers examined the victim and noted a single gunshot wound to the left side of the neck.

An autopsy revealed that the victim's death was the result of a single gunshot wound to the left side of the neck. Once the bullet entered the body, it traveled from top to bottom and left to right. The bullet settled in the abdomen. There was gun powder stippling on the victim's face and left shoulder that indicated the shooter was two and a half to three feet from the victim at the time of the shooting. According to Dr. Feng Li, Deputy Medical Examiner for Davidson County, the stippling was consistent with the victims shoulder being close to his face at the time he was shot. Dr. Li opined that the victim could have been crouched down with his shoulder drawn to his face at the time the shot was fired from above.

During the investigation, the police discovered that the victim had a gun safe in his home. ATF forms indicated that the victim owned a nine-millimeter handgun with the serial number S349. Police also discovered one spent shell casing in the living room near the victim's leg and one in a gray chair to the left of the victim. Both shots appeared to be fired from inside the home. One round hit the victim. Another round traveled through the living room couch, through the wall, and into the backside of a bathroom.

The investigation into Mr. Betts's death was led by Detective Ty Bart Downing of the Rutherford County Sheriff's Department. In conjunction with the investigation, the victim's son discovered that there was activity on the victim's bank card after his death. The purchases were traced to New York Fashion, a store in Hickory Hollow Mall. Detective Downing was able to talk to the manager of the store, who provided a description of a couple who purchased items at the store with the victim's credit card. A female signed the victim's name on the receipt. The female told the manager that the card belonged to her father. One of the transactions occurred on December 20, 2005, at approximately 12:51 p.m., after the victim's death. The card was eventually denied, and the manager claimed that he basically chased the couple out of the mall. The manager of the store wrote down the drivers' license of the female during one of the transactions. The police learned that the drivers'

license was listed to Vanessa Claude whose address was listed as 3817 Cricket Lane.

Police went to Ms. Claude's home on December 21, 2005. A male voice initially answered the door, but when police announced their presence, it was met with silence. The door was then answered by Ms. Claude, whose mother then gave permission to search the home for the source of the male voice. [The Petitioner] was hiding behind a door in a bathroom. [The Petitioner] and Ms. Claude were arrested. Police obtained permission to search the rest of the house.

At the home, officers found the jacket that had been purchased from New York Fashion with the victim's credit card and a box of coins that belonged to the victim. Additionally, the police located several of the victim's credit cards and receipts from shopping excursions. Officers later found the victim's nine millimeter handgun with the serial number S349 under Ms. Claude's bed. Additionally, they recovered a .50 caliber rifle and several other rifles wrapped in a blanket.

[The Petitioner] and Ms. Claude were interviewed several times by the police. During the first interview, [the Petitioner] informed the police that he was dating Ms. Claude and living "off and on" at her house. At first, [the Petitioner] claimed that he and Ms. Claude were probably at home all day on December 19 and 20, 2005. Later, however, [the Petitioner] admitted that he and Ms. Claude bought the coat that officers found in Ms. Claude's home. [The Petitioner] denied any knowledge that the credit card used to purchase the coat was stolen. After being informed that the credit card was stolen, [the Petitioner] later admitted that he bought some "hot" items from a man in Nashville whose name started with an "L." He described the man as heavyset with braids. The items included some handguns and were in a bag that could have also contained credit cards. [The Petitioner] told police that he paid $200 for a .357 chrome gun with a black handle, a semi-automatic weapon, and a brown shotgun. [The Petitioner] told police that the guns were under the bed at Ms. Claude's house.

[The Petitioner] informed police that he had never met the victim, did not break into the victim's home, and did not kill the victim. [The Petitioner] tried to tell police that "L" was probably responsible for the robbery of the victim.

-4-

Later, [the Petitioner] admitted during an interview that he had been at the victim's house for the purpose of getting guns. [The Petitioner] remembered that the victim opened the door wearing shorts or boxers. According to one version of the story told by [the Petitioner] to police, "L" and the victim went to the back of the house to smoke crack. When they returned, "L" placed a gun to the back of the victim's head. There was a struggle, and shots were fired. Despite his description of the events, [the Petitioner] claimed that he did not see "L" shoot the victim.

At first, [the Petitioner] claimed that the victim was unarmed. Subsequently, [the Petitioner] claimed that the victim was armed with a silver .357 revolver with a black handle when he opened the door. [The Petitioner] also claimed that "L" fired a weapon two or three times in self-defense and that at least one of the shots hit the victim in the upper chest. [The Petitioner] told police he was on the porch at the time the victim was shot but helped "L" get a bag of guns from the house. [The Petitioner] claimed to police that he saw "L" take a "big ass rifle" from the victim's house. "L" instructed [the Petitioner] to hold onto it so [the Petitioner] put the gun under a bed at Ms. Claude's house. The guns also included the revolver that the victim had when he opened the door. [The Petitioner] admitted that he handled this weapon. According to [the Petitioner], Ms. Claude drove the van to the victim's house.

During a subsequent interview, [the Petitioner] identified a person he claimed to be "L" in a photographic lineup. Detective Downing determined that the man identified by [the Petitioner] could not have been with [the Petitioner] at the victim's apartment.

After interviewing [the Petitioner], Ronald Allen Hardy also became a suspect in the crime. Police received information that the nine millimeter handgun used to shoot the victim was recovered during a traffic stop in Davidson County from Mr. Hardy's brother Yuri Hardy. The gun was actually stolen from the home of Detective Mike Chastain of the Metro Nashville Police Department. [The Petitioner] was presented with a photographic lineup that contained a picture of Mr. Hardy. [The Petitioner] denied knowing Mr. Hardy even though police were already aware that the two men knew each other. Mr. Hardy did not match the description of "L."

In his final interview with police, [the Petitioner] admitted that he knew

Mr. Hardy[3] and that Mr. Hardy and Ms. Claude were also at the victim's house the day of the incident. He maintained that he was not the shooter but admitted that he had also taken a box of coins from the victim.

According to Detective Downing, [the Petitioner] changed his story multiple times during the three interviews that were conducted. Detective Downing described [the Petitioner]'s statements as deceptive but recalled that by the end of the second interview [the Petitioner] had implicated himself in the robbery.

Detective Downing opined that the robbery was planned by Mr. Hardy, [the Petitioner], and Ms. Claude as an attempt to steal guns from the victim. After examining the evidence, Detective Downing felt that the first shot that was fired probably hit the couch. As a natural reaction, the victim ducked and attempted to cover his face. While the victim was crouched down, the second shot was fired, hitting the victim in the neck and traveling to his abdomen.

At the conclusion of the jury trial, the trial court submitted the case to the jury for deliberation. The theft charge was not presented to the jury and was eventually [dismissed] by the State. After deliberating, the jury convicted [the Petitioner] of first degree murder, felony murder, especially aggravated robbery, aggravated burglary, conspiracy to commit aggravated burglary, and conspiracy to commit aggravated robbery. The trial court merged the felony murder conviction into the first degree murder conviction. The jury sentenced [the Petitioner] to life without the possibility of parole for the murder conviction. On the remaining convictions, the trial court sentenced [the Petitioner] as a Range I violent offender to twenty-five years for the especially aggravated robbery conviction, six years for aggravated burglary, four years for conspiracy to commit aggravated burglary, and six years for conspiracy to commit aggravated robbery. The trial court ordered the sentences to run concurrently to the life sentence.

Lillard, 2009 WL 2951270, at *1-4.

After the denial of his motion for new trial, the Petitioner filed a timely notice of appeal. Id. at *4. On direct appeal, the Petitioner advanced six arguments which he alleged

_____

[3] In a separate interview that was not played for the jury, [the Petitioner] admitted that he and Mr. Hardy stole the nine-millimeter from Detective Chastain's house.

entitled him to relief.  Id. This court affirmed the Petitioner's convictions and sentences on September 15, 2009.  See id. at 13.  The Petitioner then filed a pro se petition for post-conviction relief on September 22, 2009, alleging a litany of grounds for relief and reserving the right to add additional grounds later.  The post-conviction court appointed counsel for the Petitioner on October 4, 2010.

Post-conviction counsel requested an extension of time to file an amended petition on December 1, 2010, because counsel had "been unable to meet" with the Petitioner due to his "continued incarceration in East Tennessee[.]"  On March 3, 2011, post-conviction counsel filed an amended petition, incorporating the original petition, alleging ineffective assistance of the Petitioner's trial counsel, and citing fifteen[4] facts in support of that allegation.[5]  The pertinent facts of the petition alleged (1) that counsels rendered ineffective assistance to the Petitioner in failing to pursue a mistrial after the State neglected to redact a portion of a recorded statement that referenced the Rutherford county jail and that statement was heard by the jury; (2) that, instead, counsels improperly made an agreement with the State not to pursue the mistrial, in exchange for the State's agreement not to call a witness in its case-in-chief; and (3) that counsels' failure to request the lesser included offense of facilitation was also ineffective assistance.  The State filed its response on March 29, 2011, denying that the Petitioner received ineffective assistance of counsel.

*II. Post-Conviction Hearing*

An evidentiary hearing was held on April 27, 2011.  The Petitioner, both his trial attorneys, and the prosecutor testified at the hearing.[6]

Lead counsel testified that he had sixteen years of experience, including twenty-four

---

[4] There were originally seventeen, but the Petitioner struck two of the allegations before the hearing.

[5] The additional allegations and facts supporting the ineffective assistance allegation were counsels' failure to object to the following:  multiple judges presiding over pretrial motions, other than the trial judge; the State's untimely filing of the notice to seek life without parole; the State's reference to a taped confession that did not exist; the State's improper characterization of the Petitioner's criminal history; and the Petitioner's dual conspiracy convictions.  The amended petition also cited counsels' failure to do the following:  properly investigate, interview and cross examine State's witnesses, present an opening statement, and move for judgment of acquittal.  However, review of these additional allegations are waived because they were not raised in the appellate brief as a basis for relief.

[6] The testimony of the prosecutor was given as an offer of proof, following a relevance objection by the State which was sustained by the post-conviction court.

jury trials.[7] Lead counsel explained that he was appointed to the Petitioner's case on or about January 26th or 27th of 2006 while the case was still in general sessions court. Lead counsel testified that once appointed, he sought to suppress any statements made by the Petitioner after December 27th. He further testified that he was assisted by co-counsel, and they had a plan for the Petitioner's defense. Lead counsel explained that they did not believe that the Petitioner was the shooter but were concerned about his culpability under the felony murder doctrine. Lead counsel also explained that he "could be characterized as lead counsel in the Petitioner's case" because he "had extensive jury trial experience[.]" Therefore, he "handled the trial end of it," and co-counsel "handled the appellate end of it." Lead counsel testified that co-counsel wrote the brief, which he had some input on, and that he did not recall having any additional contact with the Petitioner after the trial.

The trial court had previously ruled that a videotaped interview the Petitioner gave after his arrest would be redacted to prevent mention of the Petitioner's prior incarceration or probation.[8] During the videotape, the Petitioner mentioned that he knew a man named "Carlos" from "940"[9] – a statement that could inform the jury that the Petitioner had previously been incarcerated.[10] Lead counsel testified that during pretrial motions, the prosecutor agreed to redact from the videotape any statements that mentioned the Petitioner's prior incarceration or probation. Lead counsel testified that a reference to "940," which is a "slang term" used to describe the Rutherford County Jail, was made in the jury's presence. Lead counsel explained that he "did not jump out of his chair immediately" and object because he did not want to call the jury's attention to the statement. Lead counsel testified that he did eventually object and, as a result, he and the prosecutor had a private discussion regarding the issue out of the jury's presence. Lead counsel testified that, during this discussion, the prosecutor apologized for the statement not being redacted and offered a compromise. In exchange for lead counsel's agreement not to pursue a mistrial, the prosecutor agreed not to call a witness, Brenda Hickman, who could have established a connection between the Petitioner and the victim. According to lead counsel, he did not recall interviewing Brenda Hickman but said that he knew the nature of her testimony, and it was important "[t]hat she not testify." Lead counsel testified that he "couldn't even envision a good shot at it if she gets up there and connects up." Lead counsel also testified

---

[7] The Petitioner had two attorneys at trial and on appeal. Lead counsel refers to the Petitioner's most experienced attorney, and co-counsel refers to his other attorney.

[8] See Aldrick D. Lillard, 2009 WL 2951270, at *7.

[9] For brevity, this reference to the Petitioner's knowing a man named Carlos from "940" is hereinafter referred to as the "940 statement."

[10] See id.

that he both relayed the substance of his conversation with the prosecutor and explained the relevant law to the Petitioner, and it was ultimately the Petitioner's decision not to pursue a mistrial.

Lead counsel testified that he did request a mistrial during the Petitioner's trial after the prosecution made statements to the jury during its opening statement that detailed the Petitioner's connection to a prior, uncharged burglary of a Nashville police officer, Detective Chastain.[11] The motion was later denied in chambers without a court reporter present. Lead counsel explained that "anything about the Nashville burglary, we wanted to keep out of evidence as much as possible." Lead counsel testified that he believed he had grounds for a mistrial based on "a reference to other criminal activity." Post-conviction counsel questioned lead counsel about his failure to raise that issue on appeal or in the motion for new trial in light of his belief that he had sufficient grounds. Lead counsel testified that he did not raise the issue on appeal for the following reasons: (1) the murder weapon in the instant case was the same weapon stolen from a Nashville police officer during a burglary; (2) the Petitioner "was wearing the police officer's ring at the time he got arrested in this particular case"; and (3) "the judge ruled that . . . they could make that connection to the gun." However, lead counsel conceded that the issue could have still been raised on appeal.

Shortly thereafter, the prosecutor objected and requested that post-conviction counsel indicate where that issue was alleged in the petition. Post-conviction counsel argued that it was included in the Petitioner's pro se "petition marked under 'other.'" The prosecutor argued that he was entitled to notice of what "other" actually references and that "you have to specify and clarify what those other grounds are." The post-conviction court agreed. Post-conviction counsel then "move[d] for an amendment to the petition based upon what [he and lead counsel] discussing in the way that the record shows." However, because the issue was not specifically raised in the original or amended petition, the court sustained the prosecution's objection and noted post-conviction counsel's objection for the record.

Lead counsel testified that he was involved in discussing the lesser included offenses to be requested in the Petitioner's case. He also testified that he was unaware that the lesser included offense of facilitation was "left out." However, before post-conviction counsel could ask additional questions, the prosecutor objected to further exploration of this issue. The prosecutor argued that because this court had already found that the exclusion of the lesser-included offense of facilitation was harmless error, resulting in no prejudice, the issue had "already been disposed of . . . [and wa]s not a proper ground for consideration on the post-conviction petition." Post-conviction counsel suggested that the instant issue was different from the facilitation issue addressed on direct appeal because, in the post-conviction

---

[11] For clarity, this uncharged offense is hereinafter referred to as the "Nashville burglary."

context, the focus should be on the effectiveness of counsels' assistance, not the trial court's error. The post-conviction court stated that it would take the matter under advisement and instructed post-conviction counsel to move on to the next question.

Post-conviction counsel sought to examine the prosecutor from the Petitioner's trial, Trevor H. Lynch, about his conversations with lead counsel about the "940 statement" after it was heard by the jury. Mr. Lynch objected on relevance grounds to post-conviction counsel's request to call him as a witness during the evidentiary hearing. Post-conviction counsel argued that the testimony was relevant because "the record's not clear of what communication [between Mr. Lynch and lead counsel] was outside of the courtroom.". The post-conviction court ruled that the evidence was irrelevant but allowed post-conviction counsel to make an offer of proof.

Mr. Lynch testified that he had "spent hours going over that tape, dubbing it [b]ecause, at that time, [they] did not have the capability to do it with disks." He explained that the defense "had to rely upon us to make sure we had everything out." Mr. Lynch testified that after the "940 statement" was made, he looked at lead counsel and both of them allowed the disk to play a little longer before addressing the court. Mr. Lynch also testified that he "felt bad" because he missed it, and the statement "shouldn't have come in." Mr. Lynch further testified that he "d[id] not believe that it was prejudicial, but . . . it was still a mistake." Mr. Lynch stated that he and lead counsel[12] went into the hallway to discuss the unredacted "940 statement" and that he either offered or agreed to make a concession." Mr. Lynch testified that throughout "negotiations and preparing for this case, [lead counsel] had been [focused] on Brenda Hickman [a proposed State witness against the Petitioner]. He did not want her to testify, did not feel that her testimony should come in during our case in chief." Mr. Lynch and lead counsel eventually agreed that, in exchange for the Petitioner's agreement not to proceed with the mistrial motion, Ms. Hickman would not testify during the prosecution's case in chief. Mr. Lynch testified that someone stated that the agreement would be something for the Petitioner to consider. He also testified that lead counsel told him that "they felt like that was a good decision . . . a good strategy to keep Ms. Hickman from coming in." When asked whether he actually saw or had knowledge of whether the agreement was, in fact, discussed with the Petitioner, Mr. Lynch stated, "that would have been attorney-client privilege, and I would not have been anywhere near their discussions."

Mr. Lynch testified that although Ms. Hickman was going to help with his case in chief, "she was going to be [his] biggest witness at sentencing." He explained that Ms. Hickman was once in a relationship with Darren Yager, and they both lived with the victim at one point. Ms. Hickman was prepared to testify that Mr. Yager "knew of all the weapons

---

[12] It is not clear whether co-counsel was involved in this conversation.

that the victim possessed" and would establish a connection between Mr. Yager and the Petitioner. She was also going to testify that the victim was responsible for Mr. Yager's being arrested after he was accused of murder. According to Ms. Hickman, Mr. Yager promised the Petitioner "a payoff of all the [victim's] weapons" in exchange for the Petitioner's agreement to kill the victim. Mr. Lynch explained that the prosecution's theory was that the two men discussed this when they were in jail.

Mr. Lynch also testified that lead counsel referenced his desire to keep the information about Det. Chastain's firearms and other items, found in the home where the Petitioner was arrested, out of evidence. After allowing Mr. Lynch to be examined in the form of an offer of proof, the post-conviction court sustained the relevance objection.

Co-counsel stated that he had been licenced to practice law since 2004 and that the Petitioner's trial was his first murder trial. Co-counsel testified that both he and lead counsel were appointed by the trial court to represent the Petitioner. Co-counsel also testified that he "mainly acted as co-counsel" but conferred with lead counsel on "those matters[.]" Co-counsel explained that he wrote the application for permission to appeal and appellate brief and that he was involved with the sentencing phase.

Co-counsel explained that during the sentencing phase, his conversations with the Petitioner mainly pertained to the Petitioner's criminal history and testimony. Co-counsel testified that he did not specifically recall most of what he discussed with the Petitioner, but he explained that he typically looked at a defendant's criminal history and went over the law involving the admission of certain aspects of their criminal history in the event that he or she decided to testify. Co-counsel also testified that he mistakenly stated on the record during sentencing that the Petitioner had a conviction for forgery. However, on cross-examination, he explained that the prior conviction was actually for burglary. Co-counsel further explained that Mr. Lynch had also stated that the Petitioner had a conviction for forgery. He insisted, however, that he had a copy of the criminal history report and was uncertain why he had incorrectly stated that the Petitioner had a prior conviction for forgery. Co-counsel agreed that informing the jury that the Petitioner had a prior burglary conviction would have been more damaging than the forgery conviction, as stated in court, because the jury had just found the Petitioner guilty of attempted burglary and burglary during the guilt phase of trial.

The Petitioner testified that his lead counsel only attended their scheduled meetings "periodically" and was not present to review the video recording of his statement that the State intended to present at trial. The Petitioner further testified that the videotape recording of him was introduced at trial and that he made a statement that he knew a man named Carlos from "940" during that recording, the "940 statement." The Petitioner also testified that his attorneys never discussed filing a motion to suppress this videotape with him. He testified

that, to his knowledge, his attorneys did not object to the statement at trial. Regarding the mistrial, the Petitioner testified that, to his recollection, trial counsel "explained to him that he had a mistrial for first-degree murder, but he was trying to get the second count into that same thing and get it both together, . . . so he can get both of them miss-tried [sic] at the same time." The Petitioner explained that he did not understand what lead counsel was saying and that neither attorney ever mentioned foregoing requesting the mistrial in exchange for the State's agreement not to call Ms. Hickman. The Petitioner testified that he was never presented with that agreement or given the option not to accept the State's agreement. The Petitioner further testified that he felt misled because he was not "completely informed of what was really going on" at that time or during the trial. He testified that he was unaware of his defense strategy in general and contended that he never had any of these conversations with his attorneys. The Petitioner insisted that he asked his attorneys questions during trial, but "the only answer [he] received was that [lead counsel] was going to . . . [gave him] the impression . . . that he was going to do a mistrial[.]" The Petitioner testified that he never knew the substance of Ms. Hickman's testimony or how it would affect him until she testified at his sentencing hearing. According to the Petitioner's recollection, Ms. Hickman did not become a witness until just before or during trial because she was not on the State's list of witnesses.

On cross-examination, the Petitioner contended that his trial attorneys testified untruthfully when they told both the trial judge and the post-conviction judge that they thoroughly discussed the mistrial issue involving the "940 statement" with him and that they had jointly decided not to request a mistrial. The Petitioner insisted that he was not completely informed, nor was he told why his attorneys decided not to move for a mistrial.

The Petitioner testified that his attorneys never discussed possible jury instructions with him. He also testified that, post-trial, he conducted his own research and determined that he would have liked the jury to have received an instruction on facilitation. The Petitioner explained that he was unaware of the applicability of this instruction during trial, and he was completely uninformed about the process with jury instructions.

The Petitioner also insisted that lead counsel testified untruthfully when he said that the Petitioner was found in possession of Det. Chastain's jewelry from the Nashville burglary. However, the Petitioner admitted that he participated in the uncharged Nashville burglary involving Det. Chastain. He also admitted that, when arrested on the instant charges, he was found in possession of some of Det. Chastain's property stolen during that Nashville burglary.

The Petitioner acknowledged on cross-examination that during the robbery of the

victim in the instant case, he was present in the van with his co-defendants but insisted that he remained in the van. The Petitioner denied any knowledge that his co-defendants had planned to rob the victim and contended that he never made a statement admitting the contrary.

After the hearing, the post-conviction court preliminarily noted that it "may have been error on the part of the attorney" not "to move for a judgment of acquittal" and that the court recognized a potential double jeopardy issue with the dual conspiracy convictions. The post-conviction court also noted that "the Court of [Criminal] Appeals ha[d] previously spoken to the included offense of facilitation." The post-conviction court further noted the Petitioner had failed to show how either error caused him prejudice but that it would address the issues further in its written findings after reviewing the transcript and the record.

In issuing its written findings, the court found that "counsel was deficient in failing to move for merger of the two conspiracy convictions[.]" The post-conviction court granted the Petitioner relief by merging his two conspiracy convictions but, otherwise, found that the Petitioner had failed to prove the remaining allegations in his petition as required by law. The Petitioner then perfected a timely appeal to this court.

## ANALYSIS

The Petitioner contends that the post-conviction court committed the following reversible errors: (1) refused to allow the Petitioner to amend his petition for post-conviction relief during the evidentiary hearing to include an allegation that his attorneys failed to cite as error, in either the motion for new trial or on appeal, the trial court's denial of the Petitioner's request for a mistrial after the prosecution made statements during its opening statement regarding his participation in the prior, uncharged Nashville burglary of Det. Chastain; (2) found that the post-conviction hearing testimony from Mr. Lynch regarding his conversation with lead counsel, after the "940 statement" was made during trial, was irrelevant; and (3) concluded that the Petitioner failed to prove by clear and convincing evidence that his trial attorneys were ineffective.[13] The Petitioner contends that his trial attorneys were ineffective for failing to request a mistrial when the "940 statement" was made in the presence of the jury, after the trial court had previously ruled that all references to the Petitioner's prior incarceration or probation would be redacted, and the State agreed to do so. He further contends that his attorneys' failure to request an instruction on the lesser-included offense of facilitation also constitutes ineffective assistance of counsel.

---

[13] The issues will be addressed in reverse order.

-13-

The State responds that the court properly denied the Petitioner's request to amend his petition mid-hearing and that the Petitioner received effective assistance of counsel at trial. The State concedes, however, that the court's ruling that Mr. Lynch's testimony was irrelevant was in error but argues that this error was harmless. The State explains that the error was harmless because trial counsel's decision not to request a mistrial was a strategic decision which resulted in the prosecution agreeing not to call a witness who could have connected the Petitioner to an inmate and, ultimately, the victim. Finally, the State responds that the issue of facilitation has previously been determined by this court on direct appeal and, thus, is not an appropriate issue for post-conviction relief.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the Petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40–30–110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293–94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The Petitioner has the burden of establishing that the evidence preponderates against the trial court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

*I. Ineffective Assistance of Counsel*

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W3d 762, 766-67 (Tenn. 2001). Thus, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the defendant to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance was deficient is not enough; rather, the defendant must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under Article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a defendant raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a defendant to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Id. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

A. Counsels' Failure to Request a Jury Instruction on the Lesser Included
Offense of Facilitation

Regarding the Petitioner's allegation that his trial attorneys rendered ineffective assistance by failing to request a jury instruction on the lesser included offense of facilitation, we note that, as previously mentioned by the State, this court did address that issue on direct appeal. However, the court's inquiry on direct appeal, whether the trial court's failure to instruct the jury on the lesser included offense of facilitation was plain error, was slightly different from the issue presented today. Nevertheless, the court's analysis does illustrate the difficulty of showing prejudice on this issue. The court stated, in pertinent part,

> We acknowledge that facilitation is a lesser included offense of first degree murder when a defendant is charged with criminal responsibility for the conduct of another. See State v. Rice, 184 S.W.3d 646, 676 (Tenn. 2006); State v. Reid, 91 S.W.3d 247, 299 (Tenn. 2002). Therefore, the trial court erred by failing to instruct the jury with the offense of facilitation. The error in failing to instruct on the offense of facilitation is harmless, however. Our supreme court has held that when a jury convicts on the greater offense to the exclusion of the immediately lesser included offense, the error in failing to instruct will normally be harmless beyond a reasonable doubt. See State v. Williams, 977 S.W.2d 101, 105-06 (Tenn. 1998). The trial court instructed the jury on the charged offense of first degree murder and the immediately lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury chose to convict Appellant of the greater offense of first degree murder, the most serious charge in the indictment. Therefore, consideration of the trial court's error is not necessary to do substantial justice, and Appellant is not entitled to relief on this issue.

Aldrick D. Lillard, 2009 WL 2951270, at *9.

Our supreme court has held that when an instruction on facilitation is not requested, as in the instant case, the issue cannot be raised in a motion for new trial or on appeal. See State v. Page, 184 S.W.3d 223, 229 (Tenn. 2006). Therefore, on direct appeal, this court could only address the facilitation issue under a plain error analysis. Id. at 230. As the above quote illustrates, the focus on direct appeal was whether the trial court erred, not the effectiveness of counsel, and it was analyzed under the plain error doctrine, a more restrictive analysis. Here, the focus is on whether it was ineffective assistance for counsel not to request the instruction or object to its exclusion so it could be raised in the motion for new trial or on direct appeal. Although counsel's failure to request or insist on the instruction was

deficient, this court's analysis above, illustrates the difficulty that the Petitioner faces in proving prejudice on this issue. Because the Petitioner was convicted of all the offenses for which he was charged, several of the offenses with greater culpability than facilitation, we conclude that he has failed to show how counsel's deficiency caused him prejudice.

### B. Failure to Pursue Mistrial After Reference to Petitioner's Prior Incarceration was Introduced into Evidence

In the instant case, the Petitioner argues that his trial attorneys rendered ineffective assistance when failing to move for a mistrial after the "940 statement" was heard by the jury. The Petitioner explains that the State failed to redact all references to his prior incarceration, despite the trial court's order directing it to do so, and this failure prejudiced him at trial. On direct appeal, this court explained the danger of admitting prior bad acts of a defendant into evidence at trial, especially when the prior bad acts are similar to the offense charged, as in the instant case. See State v. Aldrick D. Lillard, No. M2008-00575-CCA-R3-CD, 2009 WL 2951270, at * 7 (Tenn. Crim. App. Sept. 15, 2009). Id. However, the panel concluded that "because Appellant failed to object to the introduction of the testimony at trial, this issue [wa]s waived." Id.

The Petitioner contends that he was never informed of the content of the conversation between the prosecutor and his trial attorneys and did not make an informed decision regarding whether to move for a mistrial. However, lead counsel testified at the evidentiary hearing that it was ultimately the Petitioner's decision not to move for a mistrial after the "940 statement" was made. Lead counsel also testified that Ms. Hickman's testimony would have been damaging to the Petitioner's defense and that he "couldn't even envision a good shot at it if she gets up there and connects up." Lead counsel explained that he, co-counsel, and the Petitioner all thought that accepting Mr. Lynch's offer to exclude Ms. Hickman's testimony during the guilt and innocence phase was "a smart . . . well-reasoned move." Lead counsel also explained that Ms. Hickman's testimony was part of what the trial court used at sentencing to enhance the Petitioner's sentence to life without parole, and Mr. Lynch's testimony essentially would have corroborated lead counsel's testimony.

Determining whether to request a mistrial is a strategic decision and considerable deference is given to trial counsel when analyzing the effectiveness of counsel's assistance regarding trial strategies. See Wiley v. State, 183 S.W.3d 317 (Tenn. 2006); see also Wiggins v. Smith, 539 U.S. 510, 2535 (2003). The trial court credited lead counsel's testimony regarding his reasons for not pursuing a mistrial, and the evidence does not preponderate against that finding. As such, counsel's decision not to move for a mistrial in exchange for the State's agreement not to present a witness was based on sound trial strategy;

the Defendant has failed to prove deficiency regarding this issue.

## *II. Trial Court's Ruling that Prosecutor's Testimony was Irrelevant*

The Petitioner argues that the trial court erred in ruling that the post-conviction hearing testimony given by the prosecutor, Mr. Lynch, was irrelevant. The State concedes that this ruling was in error but insists that this error was harmless because the "testimony was not persuasive to any fact asserted by the defense; it, in fact, supported the testimony of lead counsel that he acted properly in his decision not to pursue a mistrial. We agree with the State.

Rule 401 of the Tennessee Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TENN. R. EVID. 401. The Advisory Commission Comments to Rule 401 state that, "[t]o be relevant, evidence must tend to prove a material issue." TENN. R. EVID. 401. (Advisory Comm'n Comments).

In the instant case, the Petitioner sought to introduce Mr. Lynch's testimony "for the simple fact of what occurred outside the courtroom dealing with whether or not a motion for a mistrial would have been moved for in exchange for Brenda Hickman not testifying, because the record is not clear of what communication was outside of the courtroom." Lead counsel testified that he made an agreement with Mr. Lynch, with the Petitioner's consent, that he would not pursue a mistrial and, in exchange, Mr. Lynch wouldn't call a certain witness. However, the Petitioner maintains that he was neither informed of said agreement nor given the option to accept or reject the agreement. Because there was a dispute as to what precipitated lead counsel's decision not to pursue a mistrial and whether the Petitioner was informed of such an agreement, a material issue of a fact of consequence was created.

Mr. Lynch's statements presented in the offer of proof were consistent with lead counsel's testimony regarding the agreement. Mr. Lynch testified that either he or lead counsel stated during their conversation that the agreement was contingent on the Petitioner's acceptance and that lead counsel "talked to his client about it . . . [a]ccording to [lead counsel] they felt like that . . . was a good decision." Contrary to the court's ruling that Mr. Lynch's testimony was irrelevant, it, in fact, both corroborated lead counsel's testimony about the agreement made with Mr. Lynch after the jury heard the "940 statement" and lead counsel's testimony that he discussed the agreement with the Petitioner and sought his approval prior to accepting that agreement. Thus, it was relevant because it tended to make a fact of consequence to the determination of the action more or less probable. See TENN.

R. EVID. 401. While the court's ruling concerning the relevance of Mr. Lynch's testimony was in error, as demonstrated by the offer of proof, none of the excluded testimony was beneficial to the Petitioner. Therefore, we conclude that the trial court's error was harmless.

### III. Denial of Mid-Hearing Motion to Amend Post-Conviction Petition

Post-Conviction Procedures in Tennessee are governed in part by Rule 28 of the Tennessee Supreme Court Rules. Tenn. Sup. Ct. R. 28. Section 8(D) of the rule governs the evidentiary hearing procedures in post-conviction proceedings. See Tenn. Sup. Ct. R. 28 §8(D). It states, in pertinent part:

(D) Hearing Procedure.

(1) Petitioner shall be required to present petitioner's case and to establish the factual grounds alleged by clear and convincing evidence.

. . . .

(4) The hearing shall be limited to issues raised in the petition.

(5) If evidence is objected to on the basis that it concerns issues not raised in the petition or answer, the court may allow amendments and shall do so freely when the presentation of the merits of the cause will otherwise be subserved. The court shall liberally allow a continuance in the event an amendment is allowed to enable the objecting party to meet the evidence.

Tenn. Sup. Ct. R. 28 §8(D)(1), (4), & (5).

The Petitioner contends that the post-conviction court committed error when it denied his motion to amend his petition after the prosecution objected to his direct examination of lead counsel because it encompassed an issue that was not alleged in the petition. Specifically, the Petitioner sought to question lead counsel regarding his failure to raise the trial court's denial of his request for a mistrial, following the State's reference to another crime committed by the Petitioner, as an issue in the motion for new trial or on appeal. The State responds that the post-conviction court properly denied the Petitioner's request because the issue was not alleged in the petition, as section 8(D)(4) requires, and allowing the amendment "violates the intent of the post-conviction statute of limitations." Although, as the State argues, section 8(D)(4) does state that the hearing shall be limited to the issues

-19-

alleged in the petition, section 8(D)(5) makes it clear that the court shall freely allow amendments to the petition when evidence is objected to because the issue was not raised in the petition if the presentation of the merits of the cause will be subserved.[14]

The State argues that the post-conviction court properly denied the Petitioner's motion to amend because, once appointed, post-conviction counsel had six months to amend the petition; because post-conviction counsel did not amend the petition during that time but came prepared to ask questions about this new issue at the hearing; and because allowing the Petitioner to amend his petition during the hearing goes against the spirit of the one-year statute of limitations. However, even if this court were to accept these assertions as true, the argument misses the purpose of Tennessee Supreme Court Rule 28, section 8(D)(5). See Tenn. Sup. Ct. R. 28 §8(D)(5); see also Tenn. Hndbk., Tennessee Criminal Trial Practice § 32:18, Post-Conviction Procedure Act--Evidentiary Hearing (2011-2012). The rule only applies when a petitioner attempts to address any issue that was not part of the petition for post-conviction relief that was presumably pending for several months.

Tennessee Supreme Court Rule 28, section 8(D)(5) gives the post-conviction court the discretion to allow an amendment to a petition for post-conviction relief when evidence is objected to because it addresses issues not raised in the petition. However, when the presentation of the merits of the cause will be promoted, the rule states that the post-conviction court shall freely allow amendments to the petition. In denying the Petitioner's request to amend his petition, the post-conviction court neither addressed the provisions of Rule 28 nor stated its opinion as to whether exploration of the issue would assist in "the presentation of the merits of the cause." See Tenn. Sup. Ct. R. 28 §8(D)(5). Instead, the post-conviction court determined that the Petitioner had sufficient time to raise the issue in an amended petition prior to trial, and because he failed to do so, "[t]he Court would deny the opportunity to amend the petition to raise a new ground on the day of the hearing." The transcript reflects that the following exchange then occurred,

> The Court:     ". . . Next question. I'll allow you to make a offer of proof.
>                Well, I believe you've already made an offer of proof.
>                Is there anything else you want to ask about that particular issue
>                for this particular witness? (emphasis added)
>
> PC Counsel: There's not. I just . . .
>
> The Court:     Note your objection on the record

---

[14] The State also argues that these two provisions are in conflict. We disagree. Section 8(D)(4) is a general statement of the rule, and section 8(D)(5) is simply a limited exception to that rule.

PC Counsel:  Yes, sir.

The witness referred to by the post-conviction court in the above exchange was the lead counsel, who did not work on the appeal. The Petitioner then asked lead counsel how involved he was with the appellate brief, and trial counsel stated that co-counsel wrote the brief.  Lead counsel noted that he usually has some input with the brief but that co-counsel "is very eloquent and very competent in his writing and [he] was comfortable with it."  Lead counsel then testified that he did not think he met with the Petitioner to prepare for the appeal and that he had never been to the penitentiary to see the Petitioner.

Because it appears to this court that the evidence would assist in "the presentation of the merits of the cause[,]" the post-conviction court erred by not allowing the Petitioner to amend his petition during the hearing. See Tenn. Sup. Ct. R. 28 §8(D)(5). But cf. Wade v. State, 914 S.W.2d 97, 104 (Tenn. Crim. App. 1995) (stating that the court "shall require amendments needed to achieve substantial justice and a full and fair hearing of all available grounds for relief" but concluding that because the issue was fully developed in the context of ineffective assistance of counsel, there was no error in the trial court's refusal to allow the appellant to amend his petition).  The petitioner has the burden of proving his allegations in post-conviction proceedings by clear and convincing evidence.  See Tenn. Sup. Ct. R. 28 §8(D)(1).  Here, the Petitioner's examination of lead counsel sought to develop his claim that his trial and appellate attorneys were ineffective by illustrating that lead counsel moved for a mistrial but failed to challenge the trial court's denial of that motion on appeal.  During that examination, lead counsel testified that co-counsel primarily "handled the appellate end" of the case.[15]  Therefore, the Petitioner should have been given the opportunity to question co-counsel about this mistrial issue, allowing him to fully-develop the issue and ensuring that he received a full and fair hearing.  See Wade, 914 S.W.2d at 104 (Tenn. Crim. App. 1995).  The post-conviction court's failure to follow Tennessee Supreme Court Rule 28, section 8(D)(5), the rule of law governing this issue, prohibited the Petitioner from fully addressing his ineffective assistance of counsel claim and was an abuse of discretion.

As it stands, this court does not have sufficient information in the record to properly address the issue because the State's objection was sustained, and as a result, the Petitioner was unable to question co-counsel about his failure to raise the trial court's denial of their request for a mistrial in the motion for new trial or on direct appeal.  Accordingly, we remand this sub-issue to the post-conviction court to allow the Petitioner to amend his petition.  This remand is limited to the specific issue encompassing ineffective assistance of appellate counsel due to the failure to allege in the motion for new trial, or raise on direct appeal, the

---

[15] Later in the evidentiary hearing, co-counsel testified that he wrote the application for permission to appeal and appellate brief.

trial court's denial of the Petitioner's motion for mistrial based on the admission of impermissible character evidence regarding prior, uncharged bad acts during the prosecution's opening statement.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE